## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Myrick Dennis, Task Force Agent of the Drug Enforcement Administration (DEA), having first been duly sworn according to law, hereby depose and say:

### INTRODUCTION

1.      I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I have been employed as a United States Postal Inspector with the United States Postal Inspection Service (USPIS) since 2014. During this time, I have been assigned to the Contraband Interdiction and Investigations team, which investigates the mailing of illegal drugs and their proceeds. Since October 2020, I have been deputized as a Task Force Agent with the DEA Cleveland District Office and assigned to the Tactical Diversion Squad. I have been the case agent in multiple investigations leading to convictions in both U.S. District Court and state courts. I have been involved in more than one hundred federal and/or state investigations and have personally arrested or directly assisted in the arrests of drug law violators.

3.      I have received training in the detection and investigation of prohibited mailing offenses during a residential Basic Inspector Training program in Potomac, Maryland. I have also received training in financial investigations as they relate to drug trafficking organizations, money laundering, and asset forfeiture. I have received field training and participated in many aspects of USPIS drug investigations, including but not limited to, parcel interdiction, surveillance, controlled deliveries, execution of search warrants, interview and interrogation, confidential source/cooperating witness debriefing, pen registers, telephone toll analysis, and interception and

1

analysis of wire and electronic communications. I have written and executed search warrants that have resulted in the seizure of illegal drugs and evidence of drug violations. I am familiar with drug traffickers' methods of operation, especially as they relate to the Postal Service, including the storage, transportation, and distribution of drugs, the transfer and collection of money which represents the proceeds of drug trafficking, and money laundering.

4.      Based upon the above experience, I am familiar with the modus operandi of persons involved in illicit distribution of controlled substances as well as the terminology used by persons involved in the illicit distribution of controlled substances. I am aware that persons involved in the illicit distribution of controlled substances routinely attempt to conceal their identities as well as the locations at which drug transactions occur. These people are also known to have vehicles, properties, utilities and other items purchased in the names of others in order to conceal the association of drug activities with financial transactions. I know that individuals engaged in organized drug distribution and sales maintain extensive contact with persons from whom they receive drugs and with whom they distribute these drugs. I also know that individuals engaged in drug trafficking commonly possess and use firearms to protect their illegal drugs and proceeds from customers, competitors, rivals, and would-be robbers.

5.      Based on training and experience, I know that if a mail parcel containing suspected or known narcotics is accepted, taken into, and opened inside a residence, business, or other location, that it is likely a "stash house" or location where the narcotics are processed for retail sale. Moreover, I am aware that inside such stash houses, evidence of prior, current, or future customers and prior, current, or future shipments of narcotics are likely to be found such as: records of narcotics sales, debts, shipments, telephone books that identify customers and/or co-conspirators, and photographs of co-conspirators.

6.      Based on my training and experience, participation in criminal investigations, and the training and experience of other officers and agents with whom I am working closely, I know that:

a.      Narcotics traffickers often keep ledger books, telephone books, receipts, drug customer lists, photographs, or other papers that identify co-conspirators and their residences. These records often relate to the importation, transportation, purchasing, and/or distribution of illegal drugs and the proceeds derived from the sale of these substances. These individuals also commonly maintain extensive handwritten business records which track the flow of both illegal drugs and the currency derived from their sales.

b.      It is a common practice for drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, stash houses, and/or places of business, for easy access and to conceal such items from law enforcement authorities. Persons involved in drug trafficking have in the past concealed in their residences or stash houses caches of illegal drugs, currency, jewelry, automobile titles, and other items of value that are the proceeds of their illegal drug transactions. Additionally, documents often exist in these same places that contain evidence of financial transactions related to obtaining, transferring, secreting, or engaging in the trafficking of illegal drugs.

c.      It is common for drug traffickers to generate substantial profits as a result of illegal drug dealing. These persons often maintain large amounts of United States currency in their residences in order to operate and finance their ongoing drug distribution enterprise.

3

d.     Drugs traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses and/or telephone numbers of their associates in the trafficking organization.

e.     Drugs traffickers commonly use technology to assist in their drug trafficking activities, to include cellular telephones, Smart telephones, Blackberry devices, and computers (for drug accounting and communication, as well as other related uses).

f.     Drugs traffickers commonly use fictitious names, addresses, and business fronts, as well as other people's names, identities, and addresses to conduct their laundering activities. Drugs traffickers often place assets in names other than their own in order to conduct their money laundering as well as to avoid detection, seizure and forfeiture of proceeds they earn from their criminal activities. Even though these assets are in other people's names, the criminal associates continue to use these assets and exercise dominion and control over them. As a result, drug traffickers will commonly maintain in their residences documents reflecting the use of fictitious names, addresses, and business fronts, the use of other people's names addresses and businesses, and the dominion and control over assets by the criminal associates placed under someone else's names;

g.     Drugs traffickers will often keep safes, safe deposit box and storage unit keys, rental agreements, and invoices at their homes. Drugs traffickers also often attempt to conceal their illegal activities by storing records in safes, or off-site locations such as safe deposit boxes and storage units;

h.  Drugs traffickers often maintain the above records, documents fruits and instrumentalities of their offenses in their residences, vehicles or alternate locations they use and have ready access to.

i.  Finally, narcotics traffickers commonly maintain records for long periods of time regarding their criminal activities, whether or not they are currently engaged in such criminal activities. This is so for several reasons. I know that narcotics traffickers frequently continue their illegal activities and transactions over months or even years. Thus, they will maintain the records in order to maintain contact with the criminal associates for future illegal transactions and so that they can have records of prior transactions in which, for example, they may be owed money or might owe someone else money.  Records are permanently possessed by drug traffickers in much the same way a business will maintain records and tools of its trade, whether or not they have conducted an illegal transaction on a given day. It is my opinion that the seizure of such records will provide evidence of events reported in this affidavit, and that the records will document the commission of narcotics trafficking violations.

j.  Drug dealers commonly keep firearms in their residences/stash houses to protect themselves, the drugs and money generated through distribution of drugs.

k.  Even when drug traffickers believe they have discarded or deleted records of their trafficking and money laundering activities, those records often persist in their residences, particularly in digital form, since many records that appear to be "deleted" are often still accessible by means of forensic examination.

7.     The information in this affidavit is based on my personal knowledge and experience, oral and written reports and documents about this investigation that I have received from other law enforcement officers and individuals, physical surveillance, public records, telephone toll records, pen register and trap and trace (PRTT) information, telephone subscriber information, and Title III interceptions. The information in this affidavit is provided for the limited purpose of establishing probable cause in connection with this application for a search warrant. The information is not a complete statement of all the facts relating to this case.

8.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21 U.S.C. Sections 846 and 841(a)(1) – Conspiracy to Distribute Controlled Substances, Title 21 U.S.C. Section 841(a)(1) – Possession with Intent to Distribute a Controlled Substance, and Title 21 U.S.C. Section 843(b) – Use of Communications Facility to Facilitate a Drug Trafficking Offense, are being committed, and will be committed by Aaron CANTIE, Janan HALL, Anthony MITCHELL, Willie JONES, Andre HARRIS, Laneece ALLISON, James JACKSON, Jr., and Maurice MERRITT.

9.     I make this affidavit in support of an application for the issuance of a search warrant for the following location:

<u>PROPERTY TO BE SEARCHED</u>

10.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to the search the following premises further described in Attachment A, for the things described in Attachment B.

a. **<u>515 Euclid Avenue, Unit 1102, Cleveland, Ohio 44114 ("TARGET RESIDENCE")</u>**. The apartment style residence is located at 515 Euclid Avenue, Cleveland, Ohio 44114, and is part of The Beacon luxury residential

6

building. According to Cuyahoga County records, the structure is a 29-story, 187-unit building, parcel # 105-26-355. The target unit is located on the 11th floor and the numbers 1102 are displayed adjacent to the gray front door.

PROBABLE CAUSE

**Summary of Investigation**

11.     During this investigation and since at least as early as July 2022, AARON CANTIE (CANTIE) facilitated the delivery of over 2,000 grams worth of illicit fentanyl tablets disguised as 30mg oxycodone through the mail from Arizona to Northeast Ohio. Typically, prior to the deliveries, CANTIE travels to Arizona where his paramour and child's mother TEARA CAMMON (CAMMON) resides and arranges for the mailing of these controlled substances inside parcels by CAMMON to various addresses in the Cleveland, Ohio, area. CANTIE then travels back to Ohio and using his known cellular telephone bearing the number (216) 280-7111 ("TT-1"), tracks, coordinates, and retrieves the deliveries himself and with his close associates such as TRAVIS EZEKIEL (EZEKIEL).

12.     In order to further his criminal enterprise and to avoid detection, CANTIE uses residences in his paramours' names and also instructs them to book his travel itineraries. CANTIE also uses fake names and a network of multiple parties and their addresses as "drop" locations for the delivery of the controlled substances in order to insulate himself from these parcels.

13.     CANTIE and his associates ANTHONY MITCHELL (MITCHELL), ANDRE HARRIS (HARRIS), LANEECE ALLISON (ALLISON), and MAURICE MERRITT (MERRITT) use traditional stash or trap houses to secrete controlled substances, illicit proceeds, and other items used to assist their drug trafficking business. Finally, as established below,

7

CANTIE, the sole operator of TT-1, uses TT-1 to arrange, coordinate, oversee, and organize the deliveries of fentanyl from Arizona as well as other drugs such as cocaine, crack, and marijuana to facilitators, distributors, and customers/retail dealers such as EZEKIEL, MITCHELL, HARRIS, and ALLISON in Northeast Ohio through wire communications.

14.     Among other evidence, Title III wire interceptions since February 2023 of CANTIE, HALL, and others have demonstrated that CANTIE stores narcotics and their proceeds, as well as other evidence of the drug trafficking conspiracy at the **TARGET RESIDENCE**, as detailed below. This search warrant seeks permission to search CANTIE's and HALL's residence for this evidence, including but not limited to controlled substances, drug proceeds, cellular telephones and other electronic communication devices used to facilitate this conspiracy, firearms, drug paraphernalia, documents, receipts, bank records, USPS parcel tracking information, and shipping materials (further described in Attachment B).

### Title III Interceptions of TT-1 Regarding TARGET RESIDENCE

15.     On February 9, 2023, the Honorable Patricia A. Gaughan, U.S. District Judge for the Northern District of Ohio, issued an order authorizing the interception of wire communications over TT-1, known to be possessed and utilized by CANTIE. During this Title III investigation, investigators have intercepted numerous calls discussing drug transactions between CANTIE and various parties that demonstrate CANTIE's use of the **TARGET RESIDENCE** for the storage and distribution of controlled substances and facilitation of the drug trafficking conspiracy. Below, I detail some of these interceptions and the surveillance and other investigative techniques which corroborated them.

8

16.     On February 10, 2023, at approximately 3:19 p.m., CANTIE's TT-1 received an incoming call from THOMAS SMITH's 216-336-3738 phone[1]. Per the court-authorized ping and PRTT on TT-1, CANTIE was located at his residence at The Beacon at this time. Through law enforcement records checks, investigators found that SMITH was also the registered owner of a white Honda Accord, bearing Ohio registration JJT8765.

17.     During the call, SMITH asked CANTIE where he was located. CANTIE responded, "In the house." SMITH informed CANTIE that, "Okay, I'mma, I'mma need to see you today, like in a couple hours. Before I come back to the house and shit." CANTIE responded, "Yeah my bitch got the car and shit I'mma have to, I'll have her come back." SMITH responded, "Oh okay, that's cool. Uh, but, uh, I'm 'bouta go gamble on this game over my nigga house on 114th and Superior. So, uh, just hit me up." CANTIE acknowledged, and then SMITH acknowledged. Per the court-authorized GPS tracking device on CANTIE's black Cadillac ATS, the vehicle was parked at 8811 Detroit Avenue, Cleveland, Ohio 44102 at the time of this call. Based on my training and experience and the investigation to date, I believe SMITH informed CANTIE that he needed to obtain a resupply of drugs ("I'mma need to see you today"). CANTIE then informed SMITH that although he was at home at The Beacon, he did not have access to transportation at the moment and would need first to procure it before being able to resupply SMITH.

18.     Later on February 10, 2023, at approximately 6:14 p.m., CANTIE's TT-1 placed an outgoing call to SMITH's 216-336-3738 phone. During the call, CANTIE asked SMITH for his location. UM3738 stated his whereabouts. CANTIE responded that he needed a ride to his

---

[1] In addition to the surveillance observations, investigators believe **SMITH** is the user of this phone because it is subscribed to "Thomas Hughley", 10817 Hull (Avenue), Cleveland, OH 44106. Per CLEAR, "Thomas Hughley" appears to be a fictitious name, and **SMITH** has prior driver's license, vehicle, and financial records associated with this address.

mom's house because his girl had his car. SMITH advised CANTIE to "have your dudes pick you up." CANTIE negated and advised that he "doesn't want them to know where he stays." SMITH advised CANTIE where he would be going, and CANTIE said he would call someone else.

19.     Later, on February 10, 2023, at approximately 6:27 p.m., CANTIE's TT-1 received an incoming call from SMITH's 216-336-3738. During the call, SMITH asked CANTIE if he had found a ride. CANTIE negated. SMITH advised that he would come pick CANTIE up. SMITH also advised that his "aunt isn't answering the phone, so he's going to bring his aunt her shit tomorrow." SMITH said that he would be to CANTIE shortly. CANTIE acknowledged and told SMITH that he was going to get ready.

20.     Later, on February 10, 2023, at approximately 6:50 p.m., CANTIE's TT-1 received an incoming call SMITH's 216-336-3738. During the call, SMITH asked CANTIE about construction and advised that he was "about to pull up on the corner." SMITH advised that he was "passing 30th and Carnegie" and that he was going to "pull up on 6th and Euclid." CANTIE acknowledged and said, "by the Shake Shack." SMITH affirmed. It should be noted that Shake Shack is located at 1965 E. 6th Street, Cleveland, Ohio 44114. The restaurant is across the street from the **TARGET RESIDENCE**.

21.     On February 13, 2023, security personnel at The Beacon provided investigators with a thumb drive containing video surveillance from The Beacon on February 10, 2023. The surveillance video began at approximately 7:04 p.m., and showed E. 6th Street, directly across from the pedestrian entrance to 515 Euclid Avenue.

22.     As the video began, a black male, believed to be CANTIE, wearing a multi-colored hooded jacket, khaki pants, and brown boots exited from the pedestrian door of The

Beacon, which faces E. 6th Street. CANTIE approached a white Honda Accord with no visible registration and entered the front passenger door and sat down inside. The vehicle remained motionless for approximately 2 minutes and 18 seconds, before the white Honda pulled forward a few feet, so as to provide more space to a separate vehicle attempting to parallel back behind it. Approximately three minutes later, the headlights on the white Honda come on and the white Honda departed northbound on E. 6th Street. Throughout the video, no one was observed entering or exiting from the vehicle after CANTIE. Additionally, the window tint prevented identification of the driver or additional passengers. The rear license plate was unreadable, as the vehicle pulled away and out of view from the surveillance camera. It should be noted that on February 13, 2023, while conducting surveillance on CANTIE, investigators observed CANTIE wearing the same jacket, leading investigators to believe that CANTIE was the male seen on surveillance video getting into the white Honda.

23.     On February 11, 2023, at approximately 8:20 a.m., CANTIE's TT-1 received an incoming call from an unknown male (UM9274) utilizing phone number 216-926-9274. During the call, UM9274 said, "What up? I need, I need a 60 of them Perc 30s (fentanyl pills coded as 30mg oxycodone)," to which CANTIE responded, "Damn, nigga." UM9274 then said, "What's good, I need it." Later, UM9274 reiterated, "Hey what's up though? I need 60 of them." CANTIE did not immediately address UM9274's request, and UM9274 pressed, "Can I get 60 of the uh 30s?" CANTIE responded, "Huh?" UM9274 again said, "Yeah I need 60 of the, 60 of the Perc 30s." CANTIE said, "A'right, I gotchu', God damn, boy, you talkin' crazy on the phone." (UM9274 was speaking too openly on the call rather than speaking in code). UM9274 apologized, "My bad, my bad. Just uh hit me back." CANTIE replied, "A'right, I'm 'bouta call you soon as I get dressed. I'm getting' dressed right now. I'm 'bouta leave out, I'll hit you up."

24.     Later, on February 11, 2023, at approximately 8:57 a.m., CANTIE's TT-1 placed an outgoing call to UM9274's 216-926-9274 phone. During the call, UM9274 asked, "Hello? What up?" CANTIE replied, "Where you at, nigga?" UM9274 then said, "Um, I'm in East, I'm on Euclid, I'm in East, East somewhere, I dunno'. I'm 'bouta, I'm 'bouta come there. I'm in Euclid." CANTIE said, "A'right come on, come on real quick, bruh, I gotta go to my son' basketball game." UM9274 asked, "Where you want me to meet you at?" CANTIE answered, "Meet me in the, at my hood real quick." UM9274 then said, "A'right, I'm 'bouta pull up." CANTIE answered, "A'right, I'm comin' from downtown right now." Based on my training and experience and the investigation to date, I believe CANTIE agreed to bring the requested pills from the **TARGET RESIDENCE** to meet UM9274 in the area of Saint Clair Avenue between East 90th Street and East 105th Street.

25.     Later, on February 11, 2023, at approximately 1:27 p.m., CANTIE's TT-1 received an incoming call from an unknown male (UM6316) utilizing phone number 216-315-6316. UM6316 asked if CANTIE had "papa smurfs" on him. CANTIE negated, stating they're in the house. Per the PRTT on TT-1, at this time, CANTIE was located away from the **TARGET RESIDENCE** in the vicinity of Superior Avenue and East 79th Street. UM6316 said he had a customer just call him and was going to ask how many he wanted to purchase and would call CANTIE back with the answer. A short time later at approximately 1:41 p.m., CANTIE's TT-1 received an incoming call from UM6316's 216-315-6316 phone. UM6316 told CANTIE his customer would purchase 10 of them right now, and if he liked them would then purchase 500. CANTIE instructed UM6316 to charge the customer $3-4 per pill rather than the $2 per pill that UM6316 already told the customer. UM6316 said he knows what he's doing and doesn't want to

be greedy. Based on my training and experience and the investigation to date, I believe UM6316 was referring to blue fentanyl pills when he requested "papa smurfs" from CANTIE.

26. On February 12, 2023, at approximately 1:50 p.m., CANTIE's TT-1 placed an outgoing call to HALL's 216-650-6191 phone[2]. Per the PRTT on TT-1, at this time, CANTIE was located away from the **TARGET RESIDENCE** in the vicinity of Saint Clair Avenue and East 90th Street. During the call, CANTIE asked HALL to do him a favor, asking "I need you to count them uh them, the rest of them lil' blues for me, man. I got a play for, real quick. I don't know how many there. I'm hopin' it's like 300." HALL responded, "Okay." CANTIE instructed, "Do it right now, babe, 'cause I'm, I'm doin' this other lil' shit right now." HALL said, "Bye." CANTIE pressed, "I'm 'bouta come right there and get them. So, call me as soon as you do." HALL affirmed, "A'right." A short time later at approximately 1:55 p.m., CANTIE's TT-1 received an incoming call from HALL's 216-650-6191 phone. HALL stated, "One sixty-five." CANTIE responded, "One sixty-five? A'right. I'm 'bouta come get them." HALL then said, "You here?" CANTIE responded, "No I'm, I'm, I'm comin' right now, just got in the car. I'm on my way down there." HALL affirmed. A short time later at approximately 2:01 p.m. and 2:11 p.m., CANTIE's TT-1 placed outgoing calls to HALL's 216-650-6191 phone. CANTIE instructed, "Bring $200 out too." CANTIE said he was coming down passing (East) 55th, which HALL acknowledged. Later, CANTIE said, "Yeah, I'm right here," which HALL acknowledged.

27. On February 13, 2023, beginning at approximately 8:10 a.m., investigators established physical surveillance on CANTIE, based on the court-authorized ping and PRTT on

---

[2] The listed subscriber information for (216) 650-6191 is HALL, 15804 Grovewood Ave, Cleveland, OH 44110. HALL is a paramour of CANTIE, currently resides with him, and is the lessee (with this phone number) for the TARGET RESIDENCE.

TT-1, which placed CANTIE at the **TARGET RESIDENCE**. Shortly after surveillance was established, investigators entered the parking garage attached to The Beacon. Investigators observed a taupe colored Mercedes-Benz R500 vehicle with temporary license plate number P918152 (registered to CANTIE at 4712 E. 94th Street, Cleveland, Ohio 44125) parked in a spot on the 5th floor of the garage.

 a. At approximately 8:39 a.m., CANTIE's TT-1 placed an outgoing call to WILLIE JONES's 216-562-9267 phone[3]. After exchanging greetings, CANTIE said, "I'm abouta' hop in this shower real quick. I'll be out in like 20 minutes." JONES replied, "A'right shoot, just call me when you situated. I nee-, I uh... a half and, uh, 100, uh, blues." CANTIE then stated, "A'right, whatchu' want, uh, soft, or you want me to put, put that?" JONES replied, "Uh... you, you can put that shit together for real, I ain't trippin'." CANTIE said, "A'right, I gotchu'." CANTIE told JONES to give him approximately 20 minutes as he was going to take a shower. CANTIE mentioned he just woke up.

 b. At approximately 9:22 a.m., investigators observed CANTIE's taupe Mercedes-Benz vehicle pass by them in the parking garage at the **TARGET RESIDENCE**. The Mercedes-Benz exited from the garage and headed east on Euclid Avenue. Investigators followed the Mercedes-Benz.

 c. At approximately 9:27 a.m., CANTIE's TT-1 placed an outgoing call to JONES's 216-562-9267 phone. CANTIE asked, "Yeah, where you at, bro?"

---

[3] In addition to the surveillance observations, investigators believe JONES is the user of this phone because it is subscribed to "Dre Jones", 7209 Park Ave, Cleveland, OH 44105. Per CLEAR, JONES has prior financial records associated with this address. Finally, open-source queries identified a Cash App account associated with this phone with a profile picture of JONES with user name Quietmoney and $Cashtag $thirdy3rd

JONES replied, "Shit, uh, where you and Boo pulled up like between 35th and 36th and Longwood." CANTIE stated, "A'right." CANTIE said he was passing E. 14th Street and Carnegie Avenue in Cleveland, Ohio. JONES asked if CANTIE was going to pull up there. CANTIE affirmed he was.

d.  At approximately 9:35 a.m., investigators observed CANTIE's Mercedes-Benz at E. 36th Street and Woodland Avenue.

e.  At approximately 9:35 a.m., CANTIE's TT-1 placed an outgoing call to JONES's 216-562-9267 phone. CANTIE stated, "Pullin' up now." JONES replied, "I'm comin' out right now."

f.  At approximately 9:36 a.m., investigators observed CANTIE's Mercedes-Benz parked on Mount Hermon Avenue, Cleveland, Ohio 44115 in front of the residential building with a green door labeled 3531. The vehicle was facing west.

g.  At approximately 9:37 a.m., investigators observed an unknown black male, described as approximately 5'10", 200 pounds, with a medium sized build and wearing a black t-shirt and black hat, walking away from CANTIE's Mercedes-Benz headed west. Investigators then observed the unknown male enter a residential building through a green door labeled as 3519 on Mount Hermon Avenue. Investigators then observed CANTIE's Mercedes-Benz depart from Mount Hermon Avenue and travel east on Woodland Avenue.

h.  At approximately 9:57 a.m., investigators observed CANTIE's Mercedes-Benz arrive at Auto Zone located at 7510 Superior Avenue, Cleveland, Ohio 44103. Investigators observed CANTIE walk away from the Mercedes-Benz,

and into the Auto Zone. CANTIE was wearing the same multi-colored jacket seen on surveillance video from The Beacon on February 10, 2023. At approximately 10:02 a.m., investigators observed CANTIE back in the Mercedes-Benz by the driver's seat. CANTIE appeared to be jamming something into the bottom dashboard area. At approximately 10:06 a.m., investigators observed CANTIE re-enter the Auto Zone. At approximately 10:15 a.m., investigators observed CANTIE exit from the Auto Zone talking on a cellular telephone. CANTIE entered the Mercedes-Benz and departed. Investigators attempted to follow CANTIE in the Mercedes-Benz, but lost sight of the vehicle. Surveillance was then terminated.

28.     Based on my training and experience and the investigation to date, I believe JONES asked CANTIE for half an ounce of crack and 100 blue fentanyl pills ("I nee-, I uh... a half and, uh, 100, uh, blues"). CANTIE then asked if JONES wanted crack rather than powder cocaine ("" A'right, whatchu' want, uh, soft, or you want me to put, put that?"). JONES confirmed he wanted crack ("Uh... you, you can put that shit together for real, I ain't trippin'"). CANTIE then left the **TARGET RESIDENCE** with the requested drug quantities and kept JONES apprised of his whereabouts before parking near JONES's residence. JONES then met CANTIE in or at CANTIE's vehicle and conducted the drug transaction before returning to his residence.

29.     On February 23, 2023, CANTIE coordinated a deal between ALLISON and MERRITT wherein CANTIE first instructed HALL to provide drug proceeds from the **TARGET RESIDENCE** to EZEKIEL who CANTIE in turn instructed to provide these to ALLISON to use as payment to MERRITT.

16

a.   At approximately 1:52 p.m., CANTIE's TT-1 placed an outgoing call to ALLISON's 216-925-6560 phone. During the call, CANTIE informed ALLISON that he had a play (drug transaction) for them that required $700. CANTIE asked how much money ALLISON had on hand, to which she responded about $600. CANTIE then told ALLISON to answer her FaceTime to continue their conversation.

b.   At approximately 2:01 p.m., CANTIE's TT-1 placed an outgoing call to MERRITT's 216-712-1532 phone[4]. During the call, CANTIE told MERRITT he needed "one" (a quantity of an unknown drug). CANTIE then told MERRITT that he would have to call a female third party (ALLISON) and have her meet MERRITT.

c.   At approximately 2:02 p.m., CANTIE's TT-1 placed an outgoing call to EZEKIEL's 216-507-7343 phone. During the call, CANTIE asked EZEKIEL to do something for him and then said he would FaceTime him regarding the details.

d.   At approximately 2:08 p.m., CANTIE's TT-1 placed an outgoing call to HALL's 216-650-6191 phone. During the call, CANTIE told HALL he needed her to do him a favor very soon. CANTIE told HALL that "Beano" (EZEKIEL) would be pulling up to her soon. CANTIE then said he would FaceTime HALL.

---

[4] In June 2022, MAURICE MERRITT made a homeowners insurance claim listing this phone number and his home address of 5130 Theodore Street, Maple Heights, OH 44137. Additionally, after attributing this phone number to MERRITT, DEA investigators became aware that MERRITT is currently active as a confidential source for the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) in Cleveland. ATF subsequently confirmed MERRITT as the user of this phone number.

e.  At approximately 2:15 p.m., CANTIE's TT-1 received an incoming call from EZEKIEL's 216-507-7343 phone. During the call, CANTIE informed EZEKIEL that HALL was about to take a shower before she was able to meet with EZEKIEL.

f.  At approximately 2:29 p.m., CANTIE's TT-1 received an incoming call from HALL's 216-650-6191 phone. During the call, CANTIE instructed HALL to give EZEKIEL $450, and then told HALL he would have to FaceTime her with additional details.[5]

30.   On March 3, 2023, security personnel at the **TARGET RESIDENCE** placed a formal 3-day tow notice on CANTIE's Mercedes Benz, which had been disabled and parked in the **TARGET RESIDENCE** garage since approximately February 19, 2023. It should be noted that CANTIE flew from Cleveland to Phoenix on February 22, 2023. On March 6, 2023, per security personnel at the **TARGET RESIDENCE**, HALL came to the parking garage office and stated that the Mercedes Benz belonged to "a friend" and would be moved soon. When asked for this friend's identity, HALL refused to provide it. Based on this information, my training and experience, and the investigation to date, I believe CANTIE and HALL suppose that law enforcement is unaware of CANTIE's residence with HALL at the **TARGET RESIDENCE** and continue to store evidence of the drug conspiracy there.

TECHNICAL TERMS

31.   Based on my training and experience, I use the following technical terms to convey the following meanings:

_____

[5] CANTIE eventually grew frustrated with HALL and instead had EZEKIEL provide some of his money directly to ALLISON for the deal with MERRITT.

a. IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c. Storage medium: A storage medium is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

32.     As described above and in Attachment B, this application seeks permission to search for records that might be found in the **TARGET RESIDENCE**, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of

19

electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

33.     *Probable cause*.  I submit that if a computer or storage medium is found in the **TARGET RESIDENCE**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

   a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c.   Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating

system configurations, artifacts from operating system or application

operation, file system data structures, and virtual memory "swap" or paging

files. Computer users typically do not erase or delete this evidence, because

special software is typically required for that task. However, it is technically

possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes

automatically downloaded into a temporary Internet directory or "cache."

34.    *Forensic evidence*. As further described in Attachment B, this application seeks

permission to locate not only computer files that might serve as direct evidence of the crimes

described on the warrant, but also for forensic electronic evidence that establishes how

computers were used, the purpose of their use, who used them, and when. There is probable

cause to believe that this forensic electronic evidence will be on any storage medium in the

**TARGET RESIDENCE** because:

a. Data on the storage medium can provide evidence of a file that was once on

the storage medium but has since been deleted or edited, or of a deleted

portion of a file (such as a paragraph that has been deleted from a word

processing file). Virtual memory paging systems can leave traces of

information on the storage medium that show what tasks and processes were

recently active. Web browsers, e-mail programs, and chat programs store

configuration information on the storage medium that can reveal information

such as online nicknames and passwords. Operating systems can record

additional information, such as the attachment of peripherals, the attachment

of USB flash storage devices or other external storage media, and the times

21

the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.

22

Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

35.  *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

24

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

25

36.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

37.     I submit that this affidavit supports probable cause for a warrant to search the

**TARGET RESIDENCE** described in Attachment A and seize the items described in Attachment

B. Further, I submit that this is an ongoing investigation and I therefore request that the search

warrant, supporting application, affidavit, and associated pleadings be filed UNDER SEAL until

further order of the Court to avoid premature disclosure of the ongoing investigation, guard against

flight, avoid the destruction of evidence, avoid the intimidation of witnesses, and better ensure the

safety of agents and others; except that working copies may be served on investigative and law

enforcement officers, federally deputized State and Local law enforcement officers, and other

government officers as necessary to effectuate the Court's order.

Myrick Dennis
Task Force Agent
Drug Enforcement Administration

This affidavit was sworn to by the affiant by telephone after a PDF was transmitted by email, per
Fed. R. Crim. P. 4.1 and 41(d)(3), on this _14th_ day of March, 2023. at 12:39 p.m.

JENNIFER D. ARMSTRONG
UNITED STATES MAGISTRATE JUDGE

27